## FRED HALLMARK v. STATE.

No. A-3828.   Opinion Filed Jan. 27, 1923.

(212 Pac. 322.)

(Syllabus.)

1. **New Trial—Insufficiency of Evidence to Support Verdict.**—In passing on a motion for a new trial on the ground of insufficient evidence, it is the duty of the trial judge to carefully consider the evidence, and, unless there is sufficient competent evidence in his judgment to support the verdict, a new trial should be granted.

2. **Instructions not Prejudicial.**—Instructions given considered, and held not to be prejudicially erroneous.

3. **Appeal and Error—Harmless Error—Conviction of Lower Degree of Crime than Evidence Warranted.**—In cases where the statutes define a crime into degrees, and the trial court, without objection, instructs the jury they must "find the degree of the crime of which defendant is guilty," and, under such instructions, defendant is convicted of a lower degree than the law and evidence warranted, the error is such that defendant may not be heard to complain on appeal.

4. **Trial—Refusal of Requested Instructions Based on Theory Unsupported by Law or Evidence.**—It is not prejudicial error to refuse requested instructions based on a theory not presented by the evidence or supported by law.

5. **Rape—Evidence Sustaining Conviction.**—Evidence examined, and held sufficient to support the verdict and judgment.

Appeal from District Court, Ottawa County; S. C. Fullerton, Judge.

Fred Hallmark was convicted of the crime of rape in the second degree, and he appeals.   Affirmed.

### Statement of the Case.

This alleged crime occurred in the town of Cardin or Tar River, in Ottawa county, this state, on the 28th day of August, 1919.   According to witnesses for the state, Mrs. Etta Bishop and her daughter, Miss Josephine Bishop, were held up on the track of the Mineral Belt Railroad which runs through the town of Cardin, and the mother subjected to an

act of sexual intercourse with her assailant, who was identified by her as the defendant, Fred Hallmark. This alleged assault occurred, according to the state's witnesses, about 8:30 in the evening of that day. The evening was dark and cloudy, with flashes of lightning at frequent intervals. The information alleged that the act was accomplished by threats of immediate and great bodily harm, and without the consent and against the will of the said Etta Bishop, the said Etta Bishop resisting said Fred Hallmark to prevent said act of sexual intercourse, her resistance being overcome by the said Fred Hallmark by threats of immediate and great bodily harm directed at and toward her, and accompanied by apparent power of execution sufficient to overcome and prevent resistance on her part.

The Main street of Cardin runs east and west. The track of the Mineral Belt Railroad runs through the town in practically a north and south direction. South of Main street along the track was situated the Mineral Belt Depot and the feed store of Thomas and Wilkes. Mr. and Mrs. Wilkes at the time lived in part of the building in which the feed store was located. Farther south than the feed store, and a short distance from the track, lived a Mrs. Pennington; her house being some 200 or 300 yards from the feed store. Between the feed store and Mrs. Pennington's a spur track ran north to a coalyard. It was north of this switch, and where there are two tracks, and south of the feed store, that Mrs. Bishop and her daughter were held up. The Sinden and Rialto mines lie along this road on the east side thereof, and a kind of embankment runs along the side of the Sinden grounds by the road, and at one point there is a gap through which a road leads up into the mining grounds. The prosecuting witnesses placed the scene of the original holdup on the main track opposite this gap in the Sinden embankment, and testify that the distance

was about 200 yards south of the Thomas and Wilkes feed store. Other witnesses fix the distance from the feed store to the gap as somewhat shorter than 200 yards.

Mrs. Bishop testified: That on the evening of August 28, 1919, she left her home in Cardin and went to visit a friend in the town of Century, a mile or more southeast of Cardin. That in making the journey from Cardin to Century the usual route of travel (and the route which she took on that occasion) was partly along the track of the Mineral Belt Railroad. That after making their call they started back home some time between 8 and 8:30 in the evening, and that it was not then good dark. That on account of the threatening storm they walked rapidly up the track north toward their home, and passed a lady who was walking more slowly than they, and who was recognized as Mrs. Pennington. That when they had gone beyond her some 50 feet or more they met the defendant, walking in a southerly direction. That her daughter looked back and said. "Mamma, that man is following us; he is coming back; let's run," but that she said "It is too far to the produce house, and it wouldn't do any good," and they kept on walking pretty fast. That her daughter was on the left side, and the man came around and stuck a knife up in front of the daughter, and said, "Hold up your hands and don't holler; I have a gun here that won't make any noise, and I'll blow your heads off." That he asked if she had any money, and that when she said "No," he asked her if they didn't have any in their stockings, and said he was going to search them. That he searched their stockings above the knees, and that, when he searched the daughter's farther up, witness grabbed his hand and told him not to go any farther; that she was nothing but a child; that when he searched hers farther up she said, "What do you want? I haven't any money;" and he said, "Step over here," and repeated the threat about

the gun, and held the knife close to her, and said, "Step over here with me and don't holler." That the knife was a long curved bladed one that she had never seen anything like before. That the defendant made her go on east across the other track, and when she begged him not to make her go, he stuck the knife up against her and made her go. That they went east from the right of way to a point inside of the Sinden mining grounds. That defendant repeated the threat about the gun, and made her lie down there and made the daughter sit by them until he had finished sexual intercourse with witness. That defendant then told them they could go, but told them he would blow their heads off if they should tell anybody. That defendant then went right on up between the mills. That it was lightning a good deal at the time. That he had on a pair of blue overalls and light shirt with a dark stripe, and a white straw hat. That when he first held them up he had a handkerchief tied around his nose, and wore his hat pulled down. That later that night when the defendant was brought to her house for identification she recognized his voice as that of the man who assaulted her. That immediately after the assault she went directly to the Thomas and Wilkes feed store, and there described the man in detail and the circumstances under which the assault took place.

The testimony of Josephine Bishop, the daughter, was substantially that of her mother. There were some discrepancies between her testimony and that of her mother as to detailing the circumstances surrounding the commission of the crime, but there was nothing in the testimony of Josephine Bishop that would entitle the defendant to an acquittal.

Mrs. M. W. Pennington testified that on the evening of the 28th of August, 1919, she was living between the towns of Century and Cardin and west of the Mineral Belt Railroad

track a short distance; that about dark on that evening she walked north along the track of the railway, and met the defendant Hallmark, who was then coming south toward Century, and spoke to him; that she knew Hallmark well; that she walked slowly along, and was passed by two ladies going toward Cardin; that it was lightning so fast she decided to go back home, and as she turned around to go back home walking slowly she again met the defendant Hallmark, coming back toward Cardin; that at the rate Hallmark was walking when he passed her as she was coming north, and when she turned around and went south, the ladies could not have gone very far until Hallmark caught up with them; that it was a bad night and looked like rain, and she never looked back; and she went back home and thought no more about it until Sam Strong and John Bruce, officers, woke her up after she had gone to bed; that they asked for her husband, and made him get up and asked him what kind of clothes he wore that day, and asked to see his knife; that when they asked her if she had been up on the tracks that night she was scared, and told them that it was about 8 or 8:15 and told them about meeting the two ladies and Hallmark, and described Hallmark to the officers.

Mr. C. Wilkes of Thomas and Wilkes feed store testified that Mrs. Bishop and her daughter came to their place on the evening of the 28th of August, 1919, about 9 o'clock; that they live south of the Mineral Belt Depot; that it was about 200 yards from his place to the end of the switch to the south, and that a point on the railroad track opposite the gap in the Sinden mine would be about half that distance; that Mrs. Bishop gave a description of the party who she claimed held them up and assaulted her as a kind of low fellow, wearing blue overalls and a light-colored shirt and light-colored hat; that he went for the officers for Mrs.

Bishop, and went with the officers on the first searching trip they made; that he was present at a conversation the officers had with Mrs. Bishop after they returned; that Mrs. Bishop then sent the officers down to "old lady Pennington's house"; that Mrs. Bishop said that Mrs. Pennington was right close when this party attacked her. Witness was not present when officers brought defendant back.

Mr. J. E. Plake testified that he lived in Century; that on the night of August 28, 1919, he and his wife were visiting Mr. and Mrs. Wilkes; that they came to Wilkes place about 9 o'clock; that Mrs. Bishop and her daughter came in and complained of having been assaulted, and gave a description of the party, and that Mr. Wilkes said that was about the way Hallmark was dressed; that they were about half through dinner when the Bishops came in; that they took the Bishops home about four or five minutes after they came to Wilkes' house; that it was then dark enough that one could not see very much.

Sam Strong testified that he was an officer, and that after talking with Mrs. Bishop he and John Bruce went out to search for her assailant; that after searching for some time and finding nobody that answered the description given to them, they went back to Mrs. Bishop, and she then told them about having seen the Pennington woman on the railroad track a short time before the crime was committed; that they then went down to the Pennington house and made a search; that Mrs. Pennington then gave the information that led them to go to Hallmark's house; that they found Hallmark, his wife, and two babies in bed; that when they called him he got up and put on a pair of black pants; that they asked him where he had been that evening, and he said down to his father's; that at first he said he wore the pants he had

put on; that the overalls were lying on the floor; that they asked him if he didn't wear the overalls, and he said first that he didn't, but his wife spoke up and said he did; that they told him to put on the clothes he had worn down town, and he put on the overalls, a striped shirt, and a cap; that he said he had worn that cap; that they found the hat on the dresser later; that they went to the house of the defendant about 10 o'clock or a little later; that the defendant said afterwards that the hat they found in his house was his own; and that he had worn it that evening.

John Bruce corroborated Strong in testifying that Mrs. Bishop did not mention Mrs. Pennington the first time they were at the house, and in describing the scene at Hallmark's house he failed to mention that Hallmark said he wore the pants down town, but indicated that the wife interposed before Hallmark could answer. When they got to Mrs. Bishop's she said that he was dressed the same way as the man on the track, only he had a hat on. Hallmark, however, admitted that he had a white hat at home, but said that he just kind of forgot it, and didn't put it on.

### The Defense.

Fred Hallmark, testifying in his own defense, said: That he lived in Cardin, three blocks east and four blocks south of the Mineral Belt Depot; that he had lived in Cardin 3 years the coming March; that he had prior to that lived in Galena, Kan., for 20 years; that he had worked as a miner in Galena and down in Oklahoma ever since he had begun to work; that he would be married 4 years the coming June; that he was working at the time of the trial for the same mining company that he had worked for on the 28th day of August, 1919, the S. B. & S. Mining Company; that he was a machine man's helper, and worked underground; that on

the 28th day of August, 1919, he quit work at the usual time, 4 o'clock, went home, had supper, and came down to his father's store, the first place east of the railroad close by the depot; that while he was down there Clarence Price and Louie Saugh came to see about buying some household goods which Fred and his father had stored in the third house west of the track; that they bought the goods, and he waited with them a while until one got a dray to haul them; that this was about 7:30 o'clock; that he went to his father's store a little while, then out to the toilet, and went on south to a coal car on the switch and talked a little while to Strickland, who was unloading it, remaining there perhaps 30 minutes; that he left and went back to his father's store about 8:30 to get some tobacco, but found the store closed, and went up Main street east three blocks, and then four blocks south to his home; that he saw Pearl Holmes and her son on the street as he went home, and Mrs. Harp McGuire sitting in her door as he went by; that he did a little work around the house, and went to bed about 10 minutes to 9 or maybe 9 o'clock; that about 9:20 or 9:30 Clarence Price came to the house to get the key to the house where the furniture had been stored, as something had been forgotten; and that about 11:30 Strong and Bruce came, and jerked at the screen door, and told him to get up, that he was the man they were looking for; that when Strong and Bruce told him to put on the same clothes he had on he picked up a pair of brown pants which had fallen down by his overalls; that Strong asked if those were the same clothes he wore in the evening, and he turned to his wife, and she said, "You had on your overalls," and then he saw that he didn't have the right ones on; that he had never been arrested before in his life; that he asked them four or five times what they wanted with him, and the officers refused to tell him; that they took him to Mrs. Bishop's; that

he had never seen Mrs. Bishop before; that he had not seen her that night on the track, nor ever met her; that he had never had any connection with her; that he knew Mrs. Pennington by sight; that he saw her on the evening of August 28, 1919, when he was sitting on coal car talking with Strickland, and she was over on the main line; that he did not see her at any other time that night; that he did not meet and pass her on the track of the railroad to the south; that he was never any farther south that night than the coal car; that he was not on the main line of the track at all that night; that there was a little short fellow standing talking to her (Mrs. Pennington) when he saw her one time, believe his name was Irvin; that he sometimes went home by the road that leads up through the Sinden mine, but that it was no shorter than the other way; that Mrs. Harp McGuire was his cousin; that he saw Ida Williams that evening, standing in her window as he went into his house, and that she is his sister; that Mrs. Pearl Holmes was a trained nurse, and lived next door to his father's store; that he had worn his hat when he was out earlier in the evening, but that his cap was hanging on the door, and that he put it on, he thought, before he put on his overalls; that Mrs. Bishop said, when he was taken down there, that he might be the party—she was not positive—but it might be him if he had on a white hat; that he told her he had a white hat at home.

Mr. A. Strickland testified that he was unloading a coal car at the coalyard about 50 feet from the Thomas and Wilkes feed store on the evening of August 28, 1919; that the car was on the switch track; that Fred Hallmark came down that evening about 8 o'clock, and climbed up on the car to talk to him, "like a miner will come along and talk to a fellow"; that he stayed 15 or 20 minutes, and that he remained about 15 minutes after Hallmark left, and it was pretty dark, and

he (Strickland) went home southeast, along the railroad track and through the grounds of the Sinden mine; that when Hallmark left the car it was about 8:30 "I suppose"; and that he remained a quarter of an hour longer; that he (witness) is 6 feet 1 inch tall; that he had never met Hallmark before that night; that he didn't say what he was there for, but only talked about his work and where he worked; don't know in which direction Hallmark went when he got off the car; that it was a stormy night, cloudy and lightning, looked like rain, and there was no moon.

Mrs. Pearl Holmes testified that on the 28th of August, 1919, she lived right by Hallmark's store, by the railroad; that she had known Fred Hallmark for about 2 years; that on the night of August 28, 1919, she and her boy left home to go for her laundry about half past 8; that she saw a person going east on Main street, and followed along behind him; that he passed in front of a store, and she saw it was Fred Hallmark; that she followed him for three blocks, and that he then went south in the direction of his home; that her clock had just struck half past 8 when she left home, and they said it was five minutes fast; that it was dark when she left home, and she recognized Hallmark ahead of her by the light from Mr. Baker's barber shop; that before he went up the street she had seen him try the door of his father's store, and it was locked; that she knew what his general reputation in Cardin was for being a clean, virtuous, truthful, moral man; and that it was good. Witness had previously testified, at the beginning of her testimony, that she was a trained nurse.

Mrs. Murta Wilkes testified that it was about three minutes to 9 when the Plakes arrived for dinner on the night of August 28, 1919; that it was about 9:20 when the Bishops came in; that she had looked at the clock when the Plakes

came in; that they left about 9:30 to take the Bishops home; that while the Bishops were there, there was a discussion between them as to whether the eyes of the man who attacked them were black or blue; that after they had gotten home with the Bishops, and Mr. Wilkes and Mr. Plake had gone for the officers, Mrs. Bishop saw a man going into the cafe of Fatty Cookemgood, next door, and she followed him in, and when she came out said that she would say that was the fellow if he had on a white hat; and that man was taller and more slender than Fred Hallmark.

Mrs. Beulah McGuire, cousin of defendant, testified that she lived in Hockerville, Okla., that on the 28th day of August, 1919, she lived in Cardin, and had lived before that time in Joplin and Galena; that she had known Hallmark since he was a baby; that on August 28, 1919, she lived two blocks north from Fred Hallmark's home, and between his father's place and his place; that on August 28, 1919, in the evening, she saw Fred pass her house, going towards his home; that it was light so that she could recognize him; that his reputation in the community for being a truthful, upright, honest, moral man was good.

George Raines, George Long and John Hardwick, all of Galena, Kan., and M. D. Caldwell and Mrs. M. D. Caldwell, of Cardin, Okla., all testified that the general reputation of the defendant as being a truthful, honest, moral and upright, and industrious man was good.

Ida Williams, sister of the defendant, testified that she lived in a house on the adjoining lot to the defendant; that she saw him that evening before he went down town, and saw him come back about 8:30.

J. L. Beckner, F. M. Pulliam, Homer Hart, and G. S. Sizemore, all testified that the general reputation of the witness Mrs. Pennington for truth and veracity was bad.

Mrs Fred Hallmark testified: That her husband came home on the evening of the trouble about 5 o'clock from work; went away about 6 or 6:30; came back between 8:30 and 9 o'clock, and didn't go away again. "There are two rooms in the house; my husband and I were in the front room. I went to bed first. That the officers asked him what kind of clothes he had on, and he had got hold of a pair of pants that had been knocked down there, and they asked him were those the clothes, and he said. 'Yes, ain't they, Irene?' and I said, 'No; you had your overalls on.'" That there was nothing said about the hat. That the cap was lying there some place about the rest of the clothes. That the other pair of pants got knocked down over by the door. That the hat was on the chiffonier when the officers got back. That he still has the hat. That the cap and overalls were lying on the floor when he got up to dress. "I never noticed where the pants were when he got home."

John Bruce, recalled by the state, testified that when Fred Hallmark put on his pants, the first pair, he walked right over south of the bed, and either got them off a trunk or box that was there, or hanging up; I don't know whether they were hanging or laying, but they were at the south side of the house; his overalls were laying right beside the bed, and he passed over them; had to go about 5 or 6 feet to get his pants.

The errors assigned and relied upon for a reversal are as follows: (1) The court erred in rendering judgment against the defendant without having intelligently reviewed the evidence and approved the verdict on his own responsibility. (2) Error in giving a general set of instructions, covering the law in generalities, without applying the same to the issues in the cause. (3) Error in not presenting instructions presenting the defendant's theory and in refusing instructions asked

for that purpose by the defendant. (4) The verdict is against the evidence, and should have been set aside.

É. E. Sapp and C. B. Mitchell, for plaintiff in error.

The Attorney General and E. L. Fulton, Asst. Atty. Gen., for the State.

MATSON, P. J. (after stating the facts as above). The first assignment of error is not supported by the record. In overruling the motion for a new trial on the ground that the verdict was not supported by the evidence the trial judge indulged in a lengthy discussion on the question of his duties in the premises, and in so doing stated that he did not know as a matter of fact whether or not the defendant was guilty; that it was the duty of the jury to weigh the evidence and to pass upon the credibility of the witnesses, and in this connection further said:

"It is not the province of the court, as I understand the rule, to say or resolve the doubt or weigh the doubt, but if the court is not satisfied as to the sufficiency of all of the evidence, then it is his duty to set aside the verdict. But, reviewing all the evidence, and with all the evidence in mind, the court is of the opinion that there is sufficient competent evidence to support a verdict, even had the jury returned a verdict of guilty of rape in the first degree, and the motion for a new trial, as a whole, is overruled, and the defendant will be allowed an exception."

Whether or not the remarks of the trial judge expressing his private opinion of a case at the time he overrules a motion for a new trial constitute a part of the trial and should be incorporated in the case-made is not of material importance here.

In Lumpkin v. State, 5 Okla. Cr. 488, 115 Pac. 478, this court held that such remarks did not constitute any part of the

trial of the case, and should not be incorporated in the case-made. Counsel representing defendant, however, contends that such remarks form a "matter in the action" which may properly be brought before the appellate court for review under the provisions of section 784, Compiled Statutes 1921.

If the contention of defendant's counsel be correct, which we expressly do not hold, it is apparent in our opinion that the trial judge clearly understood his duty in the premises when he overruled the motion for a new trial on the ground that the verdict was not supported by sufficient evidence, because he expressly stated that in his opinion, after reviewing the evidence:

"There is sufficient competent evidence to support the verdict, even had the jury returned a verdict of guilty of rape in the first degree."

The foregoing statement shows the attitude of the trial judge at the time of overruling the motion for a new trial, and is a sufficient answer to the contention of counsel that the trial judge misunderstood his duties in the premises.

Under the second assignment of error, to wit, that the trial court erred in giving an instruction covering the entire eight subdivisions defining the crime of rape, it is contended that such instruction was prejudicial to the substantial rights of the defendant, in that it permitted the jury to find him guilty of the crime of second degree rape without any evidence to support the submission of the cause on such theory. It is true that under the evidence introduced by the state the defendant was guilty alone of rape under the fifth subdivision of section 1834, Compiled Statutes 1921, which is rape in the first degree. There was no evidence on the part of the defense that tended to reduce the crime committed to that of rape in the second degree.

By instructions 8 and 9 the trial court told the jury that, if they believed the defendant accomplished an act of sexual intercourse with the prosecuting witness, Mrs. Etta Bishop, a female person not the wife of said defendant, by means of threats of immediate and great bodily harm to her, accompanied by apparent power of execution, and that the said prosecutrix at the time of the commission of such act believed that if she resisted the defendant and did not yield and acquiesce in the consummation of the act of sexual intercourse by him, those threats would be carried into immediate execution, the defendant should be found guilty, but that, if the jury did not so believe, or had a reasonable doubt as to whether an act of sexual intercourse was accomplished by the defendant with Mrs. Bishop under such circumstances and by such means, they should acquit the defendant. Instructions 8 and 9 were the only instructions given by the trial judge which applied the law of the case to the evidence in issue. Considering instructions 8 and 9, together with the instruction covering all the statutory definitions of rape, the jury could not have been misled into the belief that they could find the defendant guilty under the issues, except of rape accomplished by means of threats of great and immediate bodily harm, accompanied by apparent power of execution.

In addition to the instructions commented upon above, the trial judge further instructed the jury as follows:

"(7) You are further instructed that rape committed by a male over 18 years of age upon a female under the age of 14 years, or incapable through lunacy or unsoundness of mind of giving legal consent, or accomplished with any female by means of force overcoming her resistance, or by means of threats of immediate and great bodily harm, accompanied by apparent power of execution, preventing such resistance, is rape in the first degree. In all other cases, rape is of the second degree."

"(10) You are further instructed that the crime of rape is distinguished into two degrees, rape in the first degree and rape in the second degree, and that if you convict the defendant you must find the degree of the crime of which he is guilty."

Neither of the instructions above quoted were objected to by counsel for the defendant. The first of the latter instructions is a verbatim statement of section 1837, Compiled Statutes 1921. The second, in substance, is the same as section 2739, Compiled Statutes 1921, which provides:

"Whenever a crime is distinguished into degrees, the jury, if they convict the defendant, must find the degree of the crime of which he is guilty."

While this court has repeatedly held that the instructions should be applicable to the issues raised by the evidence, and that the trial court is not required to delve into the realms of conjecture or speculation in order to instruct upon some theory of the law of the case not reasonably supported by the evidence (Smith v. State, 22 Okla. Cr. 383, 212 Pac. 1012, and cases cited therein), on the other hand this court has held:

"Where defendant is charged with murder and under the law and facts might properly have been convicted of manslaughter in the first degree, a conviction of manslaughter in the second degree is error of which defendant will not be heard to complain upon appeal." Inman v. State, 22 Okla. Cr. 161, 210 Pac. 742.

See also, Hunter v. State, 6 Okla. Cr. 446, 119 Pac. 445.

In this case the defendant might properly have been convicted of rape in the first degree, and the trial court, without objection on the part of the defendant, and, evidently misconstruing his duty in the premises where there was no evidence tending to reduce the degree of the crime, authorized the jury by the instructions given to find the defendant

guilty of a lower degree of crime than the evidence tended to disclose. There is considerable conflict in the authorities of the different jurisdictions as to whether or not such action on the part of the trial court amounts to reversible error. In this jurisdiction, however, it is held that such action constitutes error of which defendant will not be heard to complain upon appeal in cases where the crime is by statute distinguished into degrees and the defendant is convicted of a lower degree than the law and evidence warrant.

This view is consonant with the further statutory provision of this state (section 2822, Compiled Statutes 1921) substantially to the effect that on appeal no criminal judgment should be set aside or a new trial granted, among other grounds, because of misdirection of the jury, unless in the opinion of the court after an examination of the entire record it appears that the error complained of has probably resulted in the miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right of the defendant.

It is also contended that the trial judge erred—

"in not presenting instructions covering the whole case, and the defendant's theory, and in refusing instructions asked by the defendant for that purpose."

Counsel for the defendant asked the court to give some instructions upon the theory that the evidence disclosed that Mrs. Bishop voluntarily consented to an act of sexual intercourse with the defendant for the purpose of preventing any possible harm being done to her daughter. In this connection it is argued that the testimony of Josephine Bishop, the daughter, indicates conclusively that her mother voluntarily consented to the act of intercourse complained of. With this contention we cannot agree. The testimony of the daughter is not reasonably open to such construction. At the most,

in our opinion, it discloses that the mother submitted against her will by reason of threats of immediate and great bodily harm to both her and the daughter. The mother may have been impelled by such fear to submit against her will to such act more for the purpose of protecting her daughter from such treatment than for the purpose of saving herself. Rather is she to be commended than condemned for such conduct, as both statutory and natural laws give to the parent the right under such circumstances to protect his offspring. Such conduct does not constitute that species of consent which will render the act guiltless. Consenting means consent of the will, and submission under the influences of fear or terror cannot amount to real consent. We think, therefore, no prejudicial error was committed in refusing such requested instructions. The theory of the defendant was not that the prosecutrix voluntarily consented to an act of sexual intercourse with him, but that he did not commit any such act; that he was in another place at the time such act was probably committed, if committed at all. The defense interposed was practically a negation of guilt. We think the trial court's general charge presented the issues as fully for the defendant as the defense interposed by him warranted.

The further contention that the verdict is against the weight of the evidence and not supported by sufficient evidence has been commented upon by what has heretofore been said in passing upon previous assignments of error. We think it sufficient to say that a reading of the synopsis of the evidence accompanying this opinion will convince an unprejudiced person that there was ample evidence to justify the jury to conclude that the defendant was guilty of the crime charged.

Certain incompetent evidence was admitted; no timely objection, however, was made to the admission of this evidence,

nor motion interposed to strike the same from the consideration of the jury. The evidence was admitted under a mistaken impression that it formed a part of the res gestae. We are of the opinion, however, that the error is not such as should result in a reversal of the judgment in a case where the evidence reasonably discloses that the defendant should have been convicted and punished for a higher degree of the crime than that of which he was found guilty.

For reasons stated the conviction is affirmed.

DOYLE and BESSEY, JJ., concur.