## DORAN PLASTER v. STATE.

No. A-6715.   Opinion Filed Dec. 14, 1929.
Rehearing Denied Jan. 11, 1930.
(283 Pac. 805.)

Morris & Wilhite, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter called the defendant, was informed against jointly, with Judge Morris and Charley Baldwin, charged with

the crime of rape in the first degree; was tried separately and convicted of rape in the first degree; and his punishment fixed at confinement in the state penitentiary for one year. Motion for new trial was filed, considered, and overruled, and exceptions saved, and the case appealed to this court.

The testimony on behalf of the state, in substance, is as follows:

Madeline Finley, called as a witness, testified:

"I am a married woman, married on the 30th day of October, 1926; I am 16 years of age; I know Doran Plaster, Judge Morris and Charley Baldwin; before we moved to Binger I lived five miles north and west of Oney with my father and mother; on the 12th day of September, 1926, I lived up there; I went to Swan Lake Church that night with my father and mother in a wagon; the church is a mile and three-quarters from our home; after church Judge Morris asked to take me home; we started home in a Ford roadster; I don't know who was the owner of the car; we started home about 10 o'clock at night; my father and mother got home before I did; Morris drove a mile and three-quarters north and a half mile east and stopped the car; after he stopped I asked him to go on, and he said he was not in any hurry; about that time the Baldwin boy and Doran Plaster came up to where we were; Doran Plaster jumped out of the car and brought a wagon sheet up to where we were; he threw the wagon sheet down in front of the car and came to the car and told me to get out, and I told him I was not going to do it, and he said he would make me do it; he pulled me out of the car, he and Judge together; they forced me out in front of the car, I caught hold of the braces, and they pulled me away and tripped me; after he tripped me he pulled my clothes down; he took my dress up before I was on the ground; while the defendant was pulling my clothes down, Judge and the Baldwin boy was standing there; after he got my clothes down, he got on top of me, and when he got

through he held me for Judge; the defendant had sexual intercourse with me at that time; Judge had intercourse with me, and after he got through the Baldwin boy also had intercourse with me; I was not agreeing to it, I was fighting and crying and begging them to let me alone; I used what force I could; when they got through the Baldwin boy and Judge took me to the corner and the Baldwin boy took me down to the house, and I turned the lights out and took the keys and gave them to Daddy; Judge Morris got out of the car first; it was not quite a quarter of a mile from our house, Charley Baldwin went down to the house with me, and when I turned the lights out and took the key I went into the house and delivered it to my daddy and told him the boys had insulted me; my father ran out, but the Baldwin boy had gone; I don't know who came for the car. This occurred in Caddo county, Okla."

On cross-examination witness stated: They went to church that evening—

"I did not talk to any one outside the church; we left the church house after the services were over; I left with Judge Morris; I first saw Judge Morris outside the church; I did not see any one with him; he was close to the church and every one was coming out; I had known him for two or three months; I saw him pretty often; we left the church in a Ford roadster; I did not see Doran Plaster and the Baldwin boy at church; we did not pass any one on the road going over to where Morris stopped the car; he stopped the car without saying anything about it; I said, 'Let's go on,' and he said 'we are not in any hurry;' we had been there just a little while when the other boys drove up; I did not get out of the car until Doran Plaster came up and pulled me out; when Doran came up to the car, he said for me to get out, and I told him I was not going to do it, and he got hold of my hands and arms and jerked me while Judge was pushing; then Judge got out; after they got me out of the car, they puled me around in front of the car and tripped me; I got hold

of the fender brace, and he pulled me loose from it, got hold of my hands and pulled my dress up while I was standing; I do not know what time I got home that night; the first one that had intercourse with me was Doran Plaster on the wagon sheet; the lights had been turned out on the car; I never saw Harve Johnson that evening; the Plaster boy and Baldwin boy were down there by the road waiting and watching; I was fighting and kicking and Doran told me to be still; we stayed on the ground about five minutes; after he left me he just stood there by the road; he held me while Judge Morris was on me; he held my hands and I was hollowing and crying; after Judge Morris got through he held my hands while the other boy got on me; I knew Harve Johnson, and if he had been present I would have seen him; I had never had intercourse with any one before that night; when I went home I told Daddy the boys had insulted me, that I knew two of them, but did not know the other boy; I felt bad when I left where the boys had me; Judge Morris is the one that suggested that we come home after they had me down on the road; the Baldwin boy drove the car, and I sat in the middle; I did not talk with them on the way home, nor did I tell them I was going to tell Father; I told my father."

Will Miller, the father of the prosecutrix, testified as did the prosecuting witness with reference to going to church, and his daughter starting home with Judge Morris, and what took place at home when she came in, and Martha Miller, the stepmother of the prosecutrix, testified in substance the same as did her husband, Will Miller.

C. H. Haup testified to seeing the car, and arresting the defendants, Doran Plaster, Charley Baldwin, and Judge Morris; and to seeing some fruit jars in the back of the car; he had a talk with the Morris boy; did not have any conversation with Plaster.

Bill Sullivan testified to being at church that night and talking to the father of the prosecutrix, being present when she asked if Judge Morris could take her home:

"I did not see them leave; I went home with Mr. Miller in the wagon; we got home before Madeline came; when she came in she was crying and ran into the house and told her papa she had been abused; when Madeline came in she began talking to her father; I was in the room and so was his wife; I did not hear her father scolding her about being out late; when she came in she was crying, and that was proof to me she had been hurt."

Ada Sullivan, the wife of Bill Sullivan, testified in substance the same as her husband.

This is in substance the testimony offered by the state.

At the close of the testimony the defendant moved the court to dismiss the case for the reason that the testimony introduced by the state did not state sufficient facts to constitute an offense against the laws of the state of Oklahoma; and, second, that the demeanor of some of the people that were in the courtroom had been disadvantageous to the defendant. The motion was overruled and exceptions saved.

The defendant called as a witness Judge Morris. He stated he had known the prosecuting witness Madeline Finley, formerly Madeline Miller, about three months; he was at church at Swan Lake on the 12th day of September, 1926; that during the services the prosecuting witness asked him to take her home that evening; she was sitting in a car outside the church:

"She asked me to get two or three boys to come on with me; she never said why she wanted them; later she said she wanted to come up the road there, and wanted

me to wait until they came along; after she talked to me, I asked Doran Plaster, Charley Baldwin, and Harve Johnson; I think Harve Johnson is here now; we drove down the road apiece and had stopped four or five minutes when the other boys came up; the prosecuting witness first suggested stopping; she did not ask me to take her home before the boys came; after Madeline got out of the car, Harve got out; Madeline and Harve stood there laughing and talking a few minutes; after they all got out of the car, Madeline and I went up the road about a hundred yards; Madeline first suggested that we go up the road; she wanted to go up the road and jazz, and I agreed and went with her; when we got up the road a piece, she laid down on the ground and I got on top of her and jazzed her; I used no threat or violence; she volunteered that we go up there; she never told me to quit or said anything; when I got through she told me to tell one of the other boys to come up there; when I left her and went to where the other boys were, she was lying on the ground; she was not crying or anything; I told Doran Plaster, and, he went up to where she was; I remained at the car where Doran had been; I could not see what took place when Plaster went up to where Madeline was; they were lying down; Doran was gone about three or four minutes, and when he came back he told Charley Baldwin to go up to where Madeline was; he said the girl said for the boys to come up there; Charley went and stayed about three or four minutes; when he came back he said Madeline said for Harve Johnson to come; Harve went up to where she was, but he is not charged in this case; he stayed four or five minutes; Harve and Madeline came walking back to the car ,and when they got back I asked her if she was ready to go, and she said, 'yes'; there were no threats or inducements made to lead her to believe we were threatening her or using force to compel here to have intercourse with any of the parties there."

On cross-examination witness stated:

"I saw the prosecutrix, Madeline Miller, sitting in a Ford touring car outside the church; some boy and girl

were in the car with her; she asked me to take her home from church; after church she asked me if I was ready to go; I got a car from Doran Plaster and was standing down by the filling station; when she asked if I had a car, I told her no, but I thought I could get one, and she said for me to get two or three boys and tell them to come on behind our car; I did not think anything strange about her request, nor did I ask her why she wanted them to go behind us; I drove two miles north and a quarter of a mile east of Swan Lake church and stopped the car and waited until the boys came; we did not talk any during the time we were waiting; when we stopped I never asked her anything about jazzing; just as quickly as the boys stopped the car and killed the engine, Harve Johnson got out of the car, he went up to where Madeline was, and she and Harve went off and talked; we went to the south side of the car; we did not go up the road east; the other boys were standing by the side of the car at the time; Madeline called to me and said, 'Let's go up the road a little piece': I got out of the car and went up the road a piece with her, and she asked me where would be a good place to jazz; we had no blanket or anything; I told her that would be a good place, and she lay down; I had not said a word about jazzing; we were up the road a short while, as quickly as I could walk up there and jazz and come back; she was still lying there when I left; I told Doran Plaster, and he went up to where she was; he was gone about the same length of time I was, and when he returned he said Madeline said for Charley to come up; when he returned, he said Madeline said for Harve to come, and Harve went up and was gone about as long as the others; Madeline then asked me if I was ready to go; it was my first trip out with her; Charley drove the car, and I got out at the corner; she said her father did not like for two fellows to come in with her; there was nothing said between us going from the place to the Miller home."

Charley Baldwin testified, in substance, the same as Judge Morris, as to what occurred at the church house

and what took place where the prosecutrix alleged the rape was committed. In fact, the language used by the two witnesses was practically the same; the witness admits he drove the car to the home of the prosecutrix after the alleged offense had taken place.

The defendant then called Akeless De Laney, who testified he knew the prosecutrix and had had sexual intercourse with her; that the prosecutrix had asked him to have intercourse with her. Earl Robinson also testified he had had sexual intercourse with the prosecutrix; he had met the prosecutrix in the road near her home, and she had asked him to jazz her, and he walked off into the brush with the prosecutrix, and she stripped off naked and he had intercourse with her.

Harve Johnson testified for the defendant, and stated he went out with the defendant Doran Plaster and Charley Baldwin, and that Madeline was with them:

"I talked with them a while, and finally got out of the car; Doran Plaster and Madeline went up the road first; they were gone about ten minutes; all the boys went up the road, and I finally went up there; I did not have intercourse with Madeline. When we drove up, Jud Morris and Madeline were in the car; Madeline got out just as we got there; Doran and Madeline went up the road; I could not see them and could not tell what they were doing; when Plaser returned, one of the other boys went up the road."

The defendant in his own behalf testified, in substance, the same as Charley Baldwin, Jud Morris, and Harve Johnson. He denied there was any force used. His testimony, in substance, is the same as Morris' and Baldwin's as to what took place at the time the alleged rape took place. From a reading of the record it would seem that they had all thoroughly rehearsed their testi-

mony because of their fixed time they claim they were out there with the prosecutrix being almost exactly the same. The defense also called as a witness Mr. McDaniels, whose first name does not seem to be in the record, who testified he had a conversation with Madeline Miller, with reference to a man by the name of Clark that worked for her father; the conversation took place four or five years ago; Madeline told him her father hired Clark to work for him, and the way he payed him was by Clark sleeping with her. The testimony is remarkable, to say the least, for at the time this record was made it showed the age of the prosecutrix to be a little more than 16 years of age. This would have made her, according to the testimony of the witness, 11 or 12 years of age at the time he claims she made this statement.

The defendant called a witness by the name of Floyd Meeks, who testified the prosecuting witness had told him she had a venereal disease and she wanted him to get her some medicine, and that he got it for her some time in October, but the year is not given.

The defendant called Mrs. R. V. Perkins, who detailed a conversation with Madeline, in which Madeline said she might be pregnant; this conversation was about three years before, according to the record, which would have occurred about the time she was 13 years of age. The foregoing is, in substance, the testimony in the case.

The defendant has assigned seven errors alleged to have been committed by the trial court: First, the trial court erred in overruling the motion of plaintiff in error for a new trial. Second, the court erred in overruling the supplemental motion for a new trial. Third, the court erred in failing to instruct the jury upon the whole law of the case. Fourth, the court erred in giving instruc-

tions Nos. 8 and 9. The defendant contends in his fourth assignment of error that instructions 8 and 9, given by the trial court, were such an error as to entitle him to a reversal of this case.

Section 2739, C. O. S. 1921, is as follows: "Whenever a crime is distinguished into degrees, the jury, if they convict the defendant, must find the degree of the crime of which he is guilty."

Section 2740, C. O. S. 1921, says: "The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense."

It is earnestly urged by the defendant that instructions 8 and 9, given by the court, which in substance told the jury they may convict the defendant of a lesser degree of rape than that charged in the information, was error, for the reason that the information did not contain the words, "previous chaste and virtuous character."

The information in this case properly charged the crime of rape in the first degree. The defendant went to trial upon that charge without questioning the sufficiency of the information, and the trial progressed and defendant joined issues with the state upon the question of rape in both the first and second degrees, going as far as to call witnesses to disprove the fact that the prosecutrix was a girl of previous chaste and virtuous character, by having witnesses testify that they on different dates had sexual intercourse with the prosecutrix. It is shown by the state the prosecutrix was under the age of 18 years and more than 16 years. The defendant in this case by his own admission had intercourse with the prosecutrix at the date alleged in the information. The only question then to be considered is the question of

whether or not the prosecutrix was of previous chaste and virtuous character. The testimony of the state shows she was. The defendant attempted to break that down by calling witnesses who testify they had had sexual intercourse with the prosecutrix previous to the alleged offense. The question of sustaining a conviction of a defendant tried upon an information charging him with rape in the first degree, and convicted of a minor offense, has been considered by this court in several cases.

In Pittman v. State, 8 Okla. Cr. 58, 126 P. 696, in the first paragraph of the syllabus the court said: "The offense of assault with intent to commit a rape is included in an indictment for statutory rape."

In Hallmark v. State, 22 Okla. Cr. 422, 212 P. 322, in the third paragraph of the syllabus, the court said: "In cases where the statutes define a crime in two degrees, and the trial court, without objection, instructs the jury they must 'find the degree of the crime of which defendant is guilty', and, under such instruction, defendant is convicted of a lower degree than the law and evidence warranted, the error is such that defendant may not be heard to complain on appeal."

Under the evidence in this case, the jury might have found the defendant guilty of the crime of rape in the first or second degree, the issue having been clearly joined on both degrees and testimony introduced by the defendant to show the character of the prosecutrix previous to the alleged offense in order that he might be acquitted of rape in the second degree.

The instructions 8 and 9, given by the court, were fair to the defendant, and his objection thereto is without sufficient merit to justify a reversal of this case on that point.

The defendant in his third assignment contends that the court erred in failing to instruct the jury as to the whole law applicable to the essential elements of the crime for which the defendant was convicted. After a careful examination of the record, we fail to find wherein the defendant requested the court to give further instructions upon the law applicable to the different elements of the crime of which he was convicted. If the defendant desired instructions from the court further defining the facts necessary to warrant a conviction of the defendant for rape in the second degree, he should have prepared the instruction and submitted it to the court and requested him to give it, or refuse to give it, and save his exceptions should the court refuse to give the same. Failing in that, we hold that instructions 8 and 9 given by the court, sufficiently stated the law applicable to the facts on the question of the conviction of rape in the second degree.

There are other errors assigned by the defendant, but they are not of sufficient merit to require a reversal of this case. After a careful consideration of the record, we hold that the court correctly advised the jury as to the law; that the defendant was accorded a fair and impartial trial.

Finding no fundamental or prejudicial errors in the record, the judgment is affirmed.

EDWARDS, P. J., concurring.

CHAPPELL, J., absent, not participating.