FRANK C. COOPER v. STATE.

No. A-9077. May 7, 1937.
(67 Pac. [2d] 981.)

Robert J. Bell and Wallace Wilkinson, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and W. J. Counts, Co. Atty., for the State.

BAREFOOT, J. The first assignment of error was that the court erred in permitting the state to introduce the photograph of deceased. The photograph was taken about two days after the death of deceased. There was a controversy between the state and the defendant as to whether an eye of the deceased, which was black, had been caused by the fluid used by the undertaker when the body was embalmed, or by the defendant striking her at the time of her death. The jury heard the testimony on both sides, and had the opportunity to hear all the facts in reference thereto. Under these circumstances, and the general authorities, and from the law of this state, we do not think the court erred in permitting the introduction of the photograph. The court did not permit it to be introduced at first, and only after the defendant had testified in his own behalf. Early in the history of this court it was held that photographs were admissible, and their admission was a matter addressed to the discretion of the trial court, under the circumstances of each particular case. See Morris v. Territory, 1 Okla. Cr. 617, 99 Pac 760, 101 Pac. 111; Morris v. State, 6 Okla. Cr. 29, 115 Pac. 1030, 1032. In the last cited case the court says:

"The general rule is without contradiction that, where the photograph is shown to be a faithful representation of whatever it purports to reproduce, it is admissible, as an appropriate aid to the jury in applying the evidence, and this is equally true whether it relates to persons, things, or places. Rice, Crim. Ev. p. 154; Wharton's Crim. Ev. (9th Ed.) § 544."

In the above case the picture was taken three weeks after the death of deceased and the court says that this would not make the testimony incompetent, and further says:

"Nor do we believe there was any error in admitting the photographs even though they tended to show the atrocity of the crime." Cowley v. People, 83 N. Y. 464, 38 Am. Rep. 464.

We believe that with the advancement in the science of photography that it will be the policy of the courts in the future to more frequently permit the introduction of photographs in the trial of cases. We do not believe that the introduction of the photograph in this case caused undue passion or prejudice. This is clearly shown by the verdict. The defendant being charged with murder was only convicted of manslaughter in the second degree. The main case relied upon by the defendant is the case in which the defendant was given a life sentence. See McKay v. State, 90 Neb. 63, 132 N. W. 741, 39 L. R. A. (N. S.) 714, Ann. Cas. 1913B, 1034.

The next assignment of error is that the court permitted to be offered in rebuttal certain tests made by the firing of the gun of defendant into white muslin cloth at different distances, for the purpose of demonstrating at what distance there would be powder burns on the same.

The state did not offer any expert testimony in chief with reference to powder burns. One of the witnesses had simply been asked whether or not the body of the deceased showed any powder burns. The defense offered Dr. Herbert Wilson and questioned him as to powder burns, and with reference to certain tests that had been made in his presence by Major Chaney, who was also the undertaker in this case. The state, on rebuttal, put Major

Chaney on the stand, but did not question him with reference to the tests which he had made. Attorneys for the defendant made him their own witness and examined him with reference to these tests and especially with reference to the distance that powder would burn the skin or hair under similar conditions and circumstances as the case at bar. After the defendant had offered this testimony, the state in rebuttal offered a witness Clarence Owens, who qualified as an expert with reference to the use of firearms, and he gave evidence of the results of tests made by him. In these tests he used the gun of defendant, which it was admitted fired the shot that killed the deceased, and the same kind of cartridges were used. The tests were made at different distances from one to twelve inches. In these tests the witness used white muslin cloth and the defendant claimed that by the use of white cloth that the tests were not made under the same conditions and under similar circumstances, and that this was improper rebuttal testimony. Counsel for defendant, in their brief, referred to the evidence of witness Chaney as being evidence offered by the state and that the state attempted to rebut its own witness by the evidence of the witness Owens. The record discloses that counsel for defendant made the witness Chaney their own witness for the purpose of this examination, and after he had testified for the defendant, the state then offered the testimony of the witness Owens in rebuttal.

We do not think it was error for the court to admit this testimony. The fact that it was made with white muslin cloth does not so change the circumstances as to cause it to be inadmissible. The jury heard the witness Chaney for the defendant, whose tests had been made with meat and hair and under conditions which the defendant claimed were similar to the evidence in this case, and the

jury also heard the evidence of the tests made by the witness Owens for the state. The presumption is that due consideration was given to all of the testimony by the jury. This court has decided that evidence of this character is admissible. One of the first cases is that of Gibbons v. Territory, 5 Okla. Cr. 212, 115 Pac. 129. The rule in that case has since been modified to some extent by this court in the case of Irby v. State, 18 Okla. Cr. 671, 197 Pac. 526, 530; and Shepherd v. State, 51 Okla. Cr. 209, 300 Pac. 421, 423. In the Irby Case the court says:

"As a general rule an experiment introduced for the purpose of proving that the alleged result is obtained by a certain act or operation, considered as existing in the case, should not be permitted unless the conditions and circumstances under which the experiment is made are similar to those shown actually to have existed in the case. However, if the evidence shows that the experiment was made under circumstances similar, or approximately similar, to those which surrounded the original transaction, and such experiment would serve to shed any light upon that transaction, it would be admissible, although such experiment might not have been made under exactly similar conditions as attended the original transaction. The want of exact similarity would not exclude, but would go to its weight with the jury. 1 Michie on Homicide, p. 832, and cases cited. Where the competency of evidence of experiments depends upon similarity of circumstances and conditions, the question is one for the court to determine. We are satisfied that the court did not err in admitting evidence of the experiments as tending to shed some light on the firing of the fatal shot, and its weight was for the jury to determine."

In the Shepherd Case the court says:

"The general rule as to the admissibility of the result of experiments is, if the evidence would tend to enlighten the jury and to enable them to more intelligently consider the issues presented and arrive at the truth, it is admis-

sible. The experiment should be under circumstances similar to those prevailing at the time of the occurrence involved in the controversy. They need not be identical, but a reasonable or substantial similarity is sufficient. Several courts have held that the lack of identity of circumstances affects only the weight and not the competency of the evidence provided there is a degree of similarity which will assist the jury. 22 C. J. p. 755, §§ 842, 843, 850, and 852, notes; Clark v. State, 38 Tex. Cr. R. 30, 40 S. W. 992; Spires v. State, 50 Fla. 121, 39 So. 181, 7 Ann. Cas. 214.

"The experiments here were not made under identical conditions, but were under such reasonably similar conditions as would tend to throw light on the point in controversy and to assist the jury to arrive at the truth. Evidence of experiments are not conclusive; they are circumstances to be considered, weighed, and determined by the jury along with the other evidence in the case. The court did not err in admitting this evidence."

The next assignments of error are that the court erred in overruling the demurrer to the evidence, and the refusal of the court to instruct the jury to render a verdict for the defendant, and that the judgment was not sustained by sufficient evidence.

The facts in this case are that the defendant and deceased were husband and wife; that they had been married for two years; that both had been previously married and he had three children and his wife one child; that at one time the daughter of defendant and her husband had lived with them for some time, and afterwards the daughter of deceased lived with them. The record reveals that their marital relation had met with many storms and controversies. It will serve no useful purpose to go into detail with reference to them. They had quarreled, fussed, and cursed each other and then gone back together, attempting to live in happiness. On the night of the 28th

day of April, 1935, defendant had returned to McAlester from his run on the Rock Island from Amarillo, Tex., he having been a railway mail clerk on this run for several years. He first went to the home of his son-in-law and his daughter for the purpose of reading some letters and seeing his grandchild. He then went to his own home and a quarrel soon started between him and his wife because he had arrived home late and the dinner was cold. He testified it was his usual custom to bring home with him his government pistol, and that he did so on this occasion; that he usually unloaded it and hid the cartridges, but that by reason of the excitement of the quarrel on this night he failed to do so, but threw it on the bed; that he went into the kitchen to eat his dinner, but that the quarreling and fussing was so bad that his wife left and went into the east bedroom where the pistol had been left and that he followed her; that she picked up the pistol and was pointing it at him, threatening to kill him; that he grabbed the pistol; and that in the scuffle for the possession of the same, the gun was accidentally discharged, his wife being accidentally killed.

The officers and the undertaker, when first entering the house, found the body of deceased lying on the floor of the east bedroom in a pool of blood, she was lying on her face with her head to the north and her feet to the south. The bullet had hit the top of her head near the center. The gun was lying on the bed. One cartridge had been discharged and four loaded ones were in the pistol.

The shooting occurred at about 9:45 p. m., and within about ten or fifteen minutes thereafter the defendant turned out the light and left the house and went to the home of his son-in-law and related to him what had happened and they returned to the home of the defendant

and defendant went into the house, his son-in-law remaining on the outside. Some neighbor, having been informed about the difficulty and that a shot had been fired, had in the meantime notified the officers and as the defendant was coming back into the front door after re-entering the house, he was met by one of the officers who had come to make an investigation. This officer testified that as he was trying to enter the house the defendant hollowed to John—his son-in-law was named John McBee, and he was on the front porch—"My God, I have killed her," and then this witness further testified: "I says, 'Who's she?' 'My wife, who are you?' 'What are you doing here? Who called you?'" The officer, after picking up the gun, immediately arrested the defendant and took him away and on the way to the jail the defendant said: "I just come in from the run and here my woman accusing me of something because I was late she said she would shoot me, and I killed her."

The evidence further showed that the defendant's house was facing south and that there were residences just east and west of his residence. In the residence to the west lived Mr. and Mrs. L. G. Murray. They both testified about as follows: That they were at home on Sunday night, April 28, 1935; that they lived about 40 feet west of where defendant lived; that there was an east window in the west side of defendant's home; that they had just retired for the night when they heard loud cursing, swearing, and quarreling in defendant's home; that they heard the voice of defendant cursing and saw him and his wife go from the kitchen into the east bedroom and still heard quarreling and the defendant cursing. In about five minutes after they entered the east room, they heard a pistol fire; this was about 9:45 o'clock; that they saw defendant bending over toward the floor and moaning and

crying; that they saw him turn out the light in the kitchen and then return to the east bedroom, turn out the light and heard him leave in a car; that he remained in the room ten or fifteen minutes after the shot was fired. Mr. Murray testified that he remained in bed for about an hour, and thinking some one might have been injured he went to a neighbor's house and this neighbor telephoned for the officers.

Mr. J. A. Ivey, who lived in the house 25 or 30 feet just east of defendant's home, testified for the defendant. His testimony was that he had only lived at this place for three or four days; that he had heard the defendant and deceased cursing each other prior to the night of the difficulty; on that night the windows of his home were closed, but about 9:30 or 10 o'clock he heard loud talking and cursing at the Cooper home; he heard Mrs. Cooper call Mr. Cooper a "God damn son-of-a-bitch," and immediately thereafter he heard Mr. Cooper say, "Don't do that—don't do that"; that he heard a noise that sounded like a shot or something hit the wall; some few minutes thereafter he saw the defendant get into an automobile that was parked between the houses and leave the premises. The testimony showed that the defendant was away for practically an hour before he returned, he having returned just about 11 o'clock.

There was a great deal of other testimony which showed threats of the deceased toward the defendant, and many quarrels, cursings, and other evidence in the marital life of these parties which is unnecessary to relate.

It has always been the policy of this court, and other courts, to not interfere with and set aside the verdict of a jury where the evidence is conflicting and where there is evidence sufficient to sustain the same. The jury had the

opportunity to see the witnesses, to hear their evidence, to view their demeanor upon the witness stand. It is not for us to say what we would have done under similar circumstances. The jury did not seem to act under passion or prejudice. The defendant was charged with murder and only convicted of manslaughter in the second degree, and given a sentence of four years in the penitentiary.

For the reasons above indicated, we cannot see that the court erred in refusing to sustain the demurrer to the evidence, or in refusing to give an instructed verdict.

The next assignment of error is that the jury was permitted to view the premises where the killing occurred, and that while viewing the premises one of the witnesses who testified at the trial was permitted by the bailiffs to make an improper remark in the presence of the jury. The contention being that the witness Murray, who testified for the state, was at his home when the jury viewed the premises and that coming out of his house he made the statement in the presence of a part of the jury: "See— how I could hear the shot." This was first raised on a motion for new trial. It was supported by affidavits of a brother and sister of defendant who claim they were nearby and heard the remark. The state offered the evidence of the two bailiffs and the evidence of the witness Murray. All of them denied that any such remark was made. One of the bailiffs testified that the witness Murray came to his side and simply asked him: "What does this mean?" and that he told him that the jury was examining the premises and that nothing would be molested. With this he turned away and left. This was a matter that was in the sound discretion of the court and after hearing the evidence, he overruled the motion for new trial, and we do not think it was error so to do.

It is next contended that the closing argument of the county attorney was prejudicial to the defendant. On the motion for new trial, an affidavit of one of the attorneys for defendant was attached to the motion, in which it was stated:

"Gentlemen of the jury, it is your duty to enforce the laws of this state, and if you enforce the laws of this state, and if you enforce the laws fearlessly, we will not have four of five murder cases every term of court in this county."

The affidavit stated that upon objection by counsel for defendant the court sustained the objection and directed the jury not to consider the argument. Under the ruling of this court, this is not the proper way to make objection to argument of counsel. Counsel, in their brief, admit that the argument of the county attorney, standing alone, will not justify a reversal of this case. We are of the same opinion. Quitman v. State, 35 Okla. Cr. 245, 250 P. 441; Tucker v. State, 9 Okla. Cr. 587, 132 Pac. 825.

The defendant offered six requested instructions. The court gave five of them, either as defendant requested or in substance. He now insists that the court erred in refusing to give the other requested instruction. This was an instruction that made special reference to one of the instances shown by the evidence. The court, in his instructions, covered every phase of the evidence by general instructions and we do not think the defendant was entitled to have submitted an instruction referring to one event. The instructions given by the court have been carefully examined, they covered every phase of the law and gave the defendant every right to which he was entitled. Not only did the court instruct the jury with reference to the defense interposed by him, but the court told the jury that if they found that the defendant actually

caused the gun to fire, but that he did not intentionally cause the same to fire, then under such circumstances the firing of the gun would not constitute any crime on the part of the defendant, and that if they so found it would be their duty to find the defendant not guilty. This instruction was all the defendant could ask.

The next contention is that the court erred in permitting the county attorney on cross-examination of the defendant to have him make a demonstration before the jury, using a young lady, as to how the shooting occurred. We do not think this practice is commendable. We do not believe, however, that it is sufficient to cause a reversal of this case.

It is next contended that the court erred in submitting to the jury the question of second-degree manslaughter. We have examined the cases cited by defendant in support of this proposition, being Swan v. State, 13 Okla. Cr. 546, 165 Pac. 627, 631; Lovejoy v. State, 18 Okla. Cr. 335, 194 Pac. 1087; Kent v. State, 8 Okla. Cr. 188, 126 Pac. 1040; Clark v. State, 27 Okla. Cr. 11, 224 Pac. 738; Nail v. State, 33 Okla. Cr. 100, 242 Pac. 270, 272; and the California case of People v. Driggs, 111 Cal. App. 42, 295 Pac. 51.

We do not find anything in these cases which would warrant us in holding that a charge of manslaughter in the second degree should not have been given in this case. In the Kent Case, Judge Doyle quoted with approval from the case of Cannon v. Territory, 1 Okla. Cr. 600, 99 Pac. 622, where the court says:

"In a prosecution for murder, the court should submit the case to the jury for consideration upon every degree of homicide which the evidence in any reasonable

view of it suggests; and, if the evidence tends to prove different degrees, the law of each degree which the evidence tends to prove should be submitted to the jury, whether it be requested on the part of the defendant or not. It is the duty of the court to say, as a matter of law, if there is any evidence that would tend to reduce the degree of the offense to manslaughter in the second degree."

In the Swan Case the court says:

"If there is evidence, even though slight, tending to establish manslaughter in the second degree, a reversal would not necessarily follow."

In this case it was held that there was no element of manslaughter in the second degree. In the Lovejoy Case, which was an abortion case, the court found that no element of manslaughter in the second degree was found to exist. In both the Clark and Nail Cases the charge of second-degree manslaughter was upheld. Judge Edwards, in the Nail Case, quoted with approval from Negligence in Law, Vol. 3, p. 7, as follows:

"The term 'criminal negligence' has reference mainly to the authority by whom reparation is sought. An inseparable accident of criminal negligence may be that it is a violation of duty imposed for the preservation of human life. It is criminal because it constitutes a violation of an obligation to the state, and which can only be remitted by the state. Criminal negligence per se does not differ from negligence simply. The same negligence, as it affects the individual and the state, is, respectively, gross negligence and criminal negligence. While it is the groundwork of reparation to the private individual, however heinous it may be, it is no more than negligence. So soon as it is the subject-matter in respect of which reparation is exacted by the state, it becomes criminal negligence. * * * Criminal negligence then is negligence in such circumstances that it imposes an obligation remissible by the state, but irremissible by the individual actually damnified by it; and since the state will not

lightly intervene, criminal negligence must be some 'substantial thing' and not a mere casual inadvertence. Between criminal negligence, however, and actionable negligence, there is no principle of discrimination, but a question of degree only," and then say: "There must be negligence rising to the degree of criminal or culpable negligence. The culpability of a defendant is a question of fact for the jury, and the test is: Do the acts charged as criminal show a degree of carelessness amounting to a culpable disregard of the rights and safety of others, and did said acts cause the death of deceased? If so, it establishes a case of criminal negligence."

It will thus be seen that the courts do not make much of a distinction between actionable negligence and culpable and criminal negligence only as to the degree. Negligence is criminal because it constitutes a violation of an obligation to the state. The culpability of the defendant is a question of fact for the jury.

In the case at bar, the court, in its instructions defining culpable negligence, gives practically the same definition that was given in the Kent Case, supra. We do not think the court erred in submitting a charge of manslaughter in the second degree under the facts in this case. Under the evidence, the jury could have found the defendant guilty of a greater offense, and the defendant, under the holdings of this court, could not complain. Taylor v. State, 44 Okla. Cr. 58, 278 Pac. 1117; Smith v. State, 20 Okla. Cr. 301, 202 Pac. 519; Hallmark v. State, 22 Okla. Cr. 422, 212 Pac. 322; Wilmoth v. State, 20 Okla. Cr. 453, 203 Pac. 1055, 21 A. L. R. 590.

We have carefully examined the record in this case and we find that the defendant has had a fair and impartial trial. The jury of his county heard the evidence, they had an opportunity to hear his theory of the case and acquit him. Instead they found him guilty of man-

slaughter in the second degree and assessed his punishment at four years in the penitentiary. Under the law, it becomes necessary for us to affirm the judgment of the district court of Pittsburg county, and it is so ordered.

DAVENPORT, P. J., and DOYLE, J., concur.