Charles D. ARNOLD, Plaintiff In Error,

v.

The STATE of Oklahoma, Defendant In Error.

No. A–12219.

Criminal Court of Appeals of Oklahoma.

Dec. 7, 1955.

Rehearing Denied Jan. 11, 1956.

Ed Shipp, Tom Finney, Idabel, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Charles D. Arnold was charged by information in the district court of McCurtain County with the murder of one Homer Highfill by cutting him with a certain pocket knife. The case was tried to a jury, resulting in a verdict of guilty of manslaughter in the first degree, with punishment fixed by the jury at ten years in the State penitentiary at McAlester. The penalty for the crime for which accused was convicted is fixed by statute at a minimum of four years imprisonment, with no maximum, 21 O.S.1951 § 715, while the penalty for the crime charged is fixed at either death, or imprisonment at hard labor in the State penitentiary for life, at the discretion of the jury. 21 O.S.1951 § 707.

But two propositions for reversal are urged in brief, and being that: "(1) The trial court erred in permitting the jury to receive and view the pictures taken of the deceased; (2) and by reason thereof, the punishment assessed is excessive and the result of passion caused by the introduction of the pictures of the body of the deceased."

The defendant admitted cutting the deceased in the back with a pocket knife, and then when he turned, slashing at his throat with this knife. He claimed for defense that he did this because the deceased had

knocked defendant down and then at the time of the cutting had knocked defendant's wife down and was beating her, and defendant was fearful for his own life and that of his wife.

A summary of the evidence is required. A not very pretty picture is presented. The defendant operated a meat market and bought and sold a few cattle at Idabel. He had been married to his then wife for thirteen years. She operated a beer parlor in Idabel. Defendant had lived with his first wife for thirty years, and had reared a family. He did not have any children by his second wife, Ella Arnold, but she had a daughter, Jane Roe, by her first marriage. Jane was married but had separated from her husband in September, 1954, prior to the tragedy herein involved, which happened on October 14, 1954. Jane came to Idabel from Amarillo, Texas, a little more than a week previous to the tragedy, to visit her mother.

The evidence shows that the deceased, Homer Highfill, was a farmer who lived with his wife and five children south of Millerton in McCurtain County, and that he and defendant had been acquainted since in 1949. That deceased became acquainted with defendant's step-daughter, Jane, in 1950 or 1951, and that Jane and deceased had associated together off and on since that time, and apparently their marriages did not handicap them. Deceased had been dating Jane all the week prior to the tragedy. On the night prior thereto, they had been to a dance on the Oklahoma-Arkansas state line. They got back to Idabel from the dance between one and two o'clock in the morning; they had been drinking all night; they went to the Royal Cafe and ate and then to bed at Jackson's Tourist Court on the river between Idabel and Broken Bow. Jane Roe said that from the tourist court she came to her mother's home in Idabel, and to her "beer joint", arriving about 10:30 or 11 A. M. She said that the defendant and her mother knew that she was out with Homer Highfill. She said that she, Homer, the defendant and her mother sat around the "beer joint" all day drinking. That she and Homer drank

whiskey, and to commence with her mother and step-father drank beer. The beer parlor was closed around four or five o'clock, and all the parties went to Mrs. Arnold's house and changed clothes and went to Crenshaw's beer tavern south of Eagletown. They stopped on the way and purchased a pint of whiskey. Jane was to leave the next day, so they were celebrating. They went with Homer Highfill in his pickup.

On arriving at Crenshaw's beer tavern, they found several boys there, and a Mr. and Mrs. Preston Steele operating the place. The evidence is not clear as to who ordered beer. Jane Roe said she drank one beer and one coke. There was evidence that all parties drank at least one beer. It is clear that the parties several times went to the pickup to drink whiskey.

The defendant argued with a couple of young boys, and, according to Mr. Steele, all of the Arnold party wanted to dance, so that Mr. Steele asked them to leave. It was his opinion that all were intoxicated. Said he:

"A. They wanted to dance. We didn't allow dancing, and I felt there was going to be an argument, and I told them to leave.

"Q. Was there any argument between them? A. Not on the inside. There was a bunch of them talking, and I told them to leave, that I was going to close up.

"Q. What did they do? A. They went outside to the pickup and started arguing out there among themselves, mostly among themselves.

"Q. While they were there arguing, did Mr. Arnold have an argument with any of the boys there? A. I don't know of any words they had.

"Q. What happened on the outside? A. He seemed to think someone was trying to push him around. I told him to leave, Mr. Arnold had a knife in his hand. I told them to leave, I didn't want it out there.

"Q. He had his knife out in his hand? A. Yes, sir.

"Q. Was it open? A. Yes, sir.

"Q. What was he saying? A. He thought someone was trying to push him around. I don't think he threatened anyone particularly.

"Q. He was not threatening anyone in particular? A. No, sir.

"Q. Was anyone threatening him? A. No sir.

"Q. How did they get in the pickup? A. Jane was outside, Mr. Arnold next to her, Mrs. Arnold between Mr. Arnold and Homer Highfill.

"Q. Who was driving? A. Homer Highfill."

Witness Steele said that he went back into the tavern and moments later he heard a girl screaming up the road. He went back out and noticed the pickup with lights on parked in the roadway about 450 yards from the beer tavern. Witness was asked to tell what he saw, heard and observed after he went up to the pickup. Said he:

"A. Well, Jane was hollering hysterically, and I saw Mr. Arnold and Homer Highfill in the road scuffling, had the pickup parked with the lights on, and they were in front of the pickup a way, and they were scuffling. I went up there and when I got there they stopped and were standing facing one another. I saw Homer was cut here.

"Q. What became of Mr. Arnold? A. He was standing in the road.

"Q. Was anything said by him or Mr. Highfill? A. No, they didn't seem to be saying anything. When I got up there they were standing there. I got Homer and taken him back to the pickup and got him in the pickup and got him on the way to a doctor at DeQueen.

"Q. When you got Homer to the pickup where was Jane Roe? A. She came back and helped me get him to the pickup to take him to the hospital."

Witness said that it took him about twenty minutes to drive from the scene to DeQueen, Arkansas; that when he attempted to place the deceased in the pickup deceased tried to break loose and said somebody, or "they" were after him. He repeated this after getting in the truck, but did not utter a word after that, so far as witness could tell. Jane Roe was along, holding Homer Highfill's head over on her as witness drove. Homer was bleeding profusely. Witness could see a wound on Homer's throat and two in his back. He saw this before he got in the pickup. Homer became unconscious before reaching the hospital. A nurse and doctor worked with Homer, but he died in about fifteen minutes after reaching the General Hospital, at DeQueen. Witness then telephoned Sheriff Irons at Idabel, and returned to Idabel with the sheriff and a third party drove the deceased's pickup.

Jane Roe testified that soon after entering the Crenshaw beer tavern south of Eagletown at Ponka Bok, her stepfather got to arguing with two boys, and the proprietor asked them to leave. She said that she was mad at the defendant for starting the disturbance, and was fussing at him as they left the tavern. She said that defendant got in the Highfill pickup first, then her mother, then she got in next to them. Homer Highfill got under the wheel and they started home, but about 100 yards north on the road Homer stopped the pickup, because Jane's mother and father said that they wanted to get out because Jane had been fussing at defendant. The car was stopped by the bar ditch on the right, and Homer got out first and Jane's mother and step-father then got out; that she stayed in the truck but that defendant came around the truck, opened the door and pulled her out, and her foot slipped and she fell in the bar ditch, and Homer thought Charley, the defendant, had hit her, and came around and knocked the defendant down. Said she:

"A. Yes, sir, and Homer came around and hit Charley and knocked him down. I was telling him that Charley had not hit me, that I had fallen, but Homer got mad at me.

"Q. Tell what was said and done. A. He turned to me and called me a little bitch, and said I caused him to hit the best friend he had, and he hit me and knocked me back down in the ditch, and mother told him not to hit me, or something. He turned and hit her.

"Q. Go ahead. A. When I came out of the ditch I saw he and Charley were together. I was still trying to stop the fight, to keep any of them from fighting. When I walked up I put my hand on Homer's back and I felt the blood. I turned around and started screaming. Charley got loose from him and run. I turned around to tell Charley you had better run, Homer would kill him, and Homer said he would beat the hell out of all of us, or something, and the Steele boy came up and Homer was coming back. I really, I don't know how he was, I seen blood all over Homer's clothes, I told the boy, 'Let's take him to the hospital, he is hurt', and we put him in the pickup."

The defendant testified and gave his version of his difficulty with the deceased. It appears that they had never had any trouble before, but all had been drinking and were asked to leave the Crenshaw tavern, and were in Homer Highfill's truck returning to Idabel and had gotten about 300 yards up the road when the defendant asked Homer to stop. Said he:

"A. Of course, Jane had been drinking. She reached over and slapped me in the face, over my wife, and I says, 'Jane, hon, don't you know you will break my glasses?' And my wife says, 'No, no, Jane, don't hit Charley'. I saw she was going to be disagreeable, and was pretty well under the influence."

Witness said that all got out of the pickup and as Jane got out she slipped down, and that Homer came around the car and hit him and knocked him down and kicked him. Witness further testified:

"Q. After he knocked you down, what happened or was said? A. He says, 'Jane, you caused me to hit one of my best friends, you damned little bitch you', and he drew back to hit her and says, 'I am going to kill every one of you'. Ella run up and says, 'Homer, Homer, don't do that, don't hit my baby.' He says, 'I will kill every one of you'. He drew back and knocked her down. I was getting up and I seen just to save our lives or something, what I would have to do, and had no strength, I got my little knife out.

"Q. Where was your wife when you got up with your knife? A. She had gone over to try to quiet the screaming and hollering, telling him not to do it, and he hit my wife. That was the second time.

"Q. After he hit your wife, what did you do? A. I cut him twice.

"Q. Why did you cut him twice? A. I didn't know what he hit me with, I didn't know what he hit my wife with, I was afraid he would kill her, or do her some great bodily injury, and it seemed like he had gone wild and was to kill us all.

"Q. After you cut him twice at least, what did he do? A. He turned and grabbed me, and I cut at him.

"Q. After you made the last cut at him, what did you do? A. I run.

"Q. Which direction did you run? A. North, up the highway.

"Q. What did Homer do? A. He came right out after me.

"Q. How far did you run up the highway? A. I thought I ran at least a hundred yards and was gaining on him. I was going away ahead of him.

"Q. Did he catch you? A. No, sir."

Witness testified that he lost his glasses, false teeth and hat, and that he and his wife walked up the road and hired an Indian to drive them home to Idabel.

Mrs. Ella Arnold testified as to the facts of the difficulty between her husband and Homer Highfill substantially as recounted by the defendant.

The State introduced rebuttal evidence to show that neither the defendant nor his wife had just after the tragedy claimed that deceased had kicked either of them, or hit the wife the second time.

There was evidence that defendant was subject to epileptic fits and that he had a weak left hand due to accidental cutting of an artery in his arm years prior. A number of witnesses testified to knowing defendant's reputation in the community in which he resided for being a peaceable and law-abiding citizen, and said that it was good.

The evidence conclusively shows that the defendant and the deceased had been good friends and with the knowledge of the mother and step-father deceased had been paying court to their married daughter off and on over a period of years. The deceased was a robust man, the defendant was handicapped physically, but under the influence of alcohol was of a combative nature. He argued with young boys, he had his knife out and was acting belligerent prior to any words with his friend Homer Highfill. All were intoxicated and Jane and her step-father had been in a heated fuss, and were angry at each other. The fatal difficulty commenced when Homer saw the defendant open the cab door and Jane either was pulled out or got out and fell in the ditch. Homer hit the defendant. A general fight ensued, and defendant admittedly cut the defendant in the back twice and when he turned cut him in the throat once. The jury would have been justified in assessing a much heavier penalty.

But the defense contends that the ten years imprisonment assessed was due to the trial court permitting the introduction by the State of three ordinary kodak pictures taken by the Sheriff in the presence of the undertaker, and showing the cuts inflicted. These pictures were made after the undertaker had cleaned the body and sewed up the cuts. The undertaker testified that the long cuts on deceased's back did not go into the cavity, but were shallow cuts, but the cut across the throat, which was barely discernable in the picture, had cut an artery. The cuts were not open or so revolting in appearance as to shock a viewer. At the time the three pictures were introduced in evidence, counsel for defendant had not made his opening statement. The undertaker, Bill Norwood, was the first witness called for the State. The prosecution had no way of knowing just what the defense would be. Presumably it would be self-defense. At all events, he was apparently attempting to prove just how the deceased met his death, and the court on consideration permitted the jury to see the little kodak pictures, of dimension 2″ x 2″.

The undertaker testified that he had been in the business of an undertaker since 1947, and had had some experience in handling bodies where death was caused by knife wounds. It was his opinion, based on such experience, that the deceased bled to death before he arrived at the hospital. Other evidence showed that deceased died within a few minutes after reaching the hospital. This witness said that Sheriff Irons took the pictures in the funeral home and in the presence of witness.

Did the court err in admitting the pictures under the circumstances in this case?

The rule has been established in this jurisdiction that the admissibility of photographs in evidence is a matter addressed to the discretion of the trial court, under the facts and circumstances of each particular case. See Cooper v. State, 61 Okl.Cr. 318, at page 320, 67 P.2d 981, at page 983, where in the body of the opinion this court said:

"* * * Early in the history of this court it was held that photographs were admissible, and their admission was a matter addressed to the discretion of the trial court, under the circumstances of each particular case. See Morris v. Territory, 1 Okl.Cr. 617, 99 P. 760, 101 P. 111; Morris v. State, 6 Okl.Cr. 29, 115 P. 1030, 1032."

It is basic in this jurisdiction that photographs are admissible in evidence to illustrate or clarify some issue of the case

where such photograph is shown to be a faithful reproduction of whatever it purports to reproduce. Hudman v. State, 89 Okl.Cr. 160, 205 P.2d 1175.

■ The trial court admitted the photographs for the purpose of showing the location, nature and extent of the three knife wounds on the body of the deceased. We do not believe in this case that the introduction of the photographs caused undue passion or prejudice. The mildness of the verdict refutes such thought. Therefore, from the record before us we can not say that the court abused its discretion.

The verdict and judgment must, therefore, be, and hereby is affirmed.

JONES, P. J., and BRETT, J., concur.