**Darrell Lee ANDREWS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–75–272.**

Court of Criminal Appeals of Oklahoma.

Oct. 18, 1976.

James S. Steph, Okmulgee, for appellant.

Larry Derryberry, Atty. Gen., Frank Muret, Asst. Atty. Gen., for appellee.

## OPINION

BRETT, Presiding Judge.

The appellant, Darrell Lee Andrews, hereinafter referred to as defendant, was charged with the crime of Murder in the First Degree, in Case No. HCRF–74–43, and Case No. HCRF–74–44 in the District Court, Okmulgee County, as the result of the deaths of Walter Hembree and Burton Brewer, a Deputy Sheriff. The cases were consolidated for jury trial and the defendant was convicted in each case. The defendant was sentenced to Death, the mandatory punishment imposed by the statute in effect at the time, 21 O.S.Supp.1974, § 701.3.

Hembree and Brewer were killed during a shooting at the house of Joe Brison, the defendant's grandfather. From the State's evidence, the jury could have found the following facts. Just before midnight on the night of July 25, 1974, the radio dispatcher for the Henryetta Police Department put out a call dispatching all cars to the Joe Brison residence because a report had been received that there was a man there with a shotgun, possibly holding a hostage. Richard Larney, Henryetta Chief of Police, and Walter Hembree, a wrecker driver who served as an auxillary law enforcement officer, were the first to arrive on the scene. Larney testified that he and Hembree approached the Brison house from the southwest. Larney knocked on the door while Hembree waited behind him on the steps located on the south side of the porch. Immediately a shotgun blast hit Larney in the face and shoulder. As he

scrambled off the porch a second blast hit him in the left leg. Larney was knocked to the ground by the blast but was able to crawl to the west side of the porch where he saw Hembree lying in the yard on his back 15 feet or more from the front steps where he had stood. He testified that he had not seen Hembree shot but that the shots which had hit him had come from the east side of the house. Larney remained where he was for three or four minutes longer when he heard another shot followed shortly by still another shot and someone screaming "I give up, don't kill me." Everett Clayton, a Deputy Sheriff for Okmulgee County, arrived soon after Larney and Hembree. Clayton testified that as he got out of his car he heard a shot and turned to see Hembree fall. There was a second shot and he heard Larney call out. Clayton testified that at the time the shots were fired there were no other law enforcement officers on the scene. Almost immediately after the second shot, however, Dayle James, a Highway Patrol Officer, arrived. Shortly thereafter a number of other cars arrived. A few minutes after the second shot, Clayton heard a third and then a fourth shot. After the shooting had stopped someone told him that Deputy Brewer had been shot. Clayton went to Brewer's car, and saw the body lying close by the car. The car was parked approximately 30 feet south of an outbuilding, located to the east of the Brison house. Clayton then made a search of the area which yielded two spent shotgun shells found under a window at the south of the house, a loaded shell located to the east of the house, and another loaded shell located at the corner of the outbuilding. Clayton testified that he gave these shells to Ray Lambert for the purpose of ballistic tests and they were subsequently admitted into evidence as State's Exhibits Nos. 3, 4 and 5. M. F. Grace, Chief of Police of Morris, Oklahoma, arrived at the scene at the same time as Deputy Brewer. The two men stopped their cars east of the house ap-proximately 60 feet apart. Grace watched as Brewer got out of his car and crouched beside it on the driver's side observing the house. Grace was also crouched beside his car when he saw someone run from the outbuilding toward Brewer's car. He shouted a warning to Brewer who turned around and was shot. Grace witnessed the shooting and testified that afterwards the assailant stepped from behind Brewer's car and Grace shot him. As Grace prepared to shoot again, the man screamed, "don't shoot, don't shoot, I give up." Grace iden-tified the wounded man, who that night was wearing two bandoliers with shotgun shells in them, as the defendant, Darrell Lee Andrews. Tom Johnson, Okmulgee Police Officer, also witnessed the shooting of Deputy Brewer and testified to the same facts as Chief Grace. He identified the defendant as the person he saw shoot Deputy Brewer. Ray Lambert, a firearms examiner for the Oklahoma State Bureau of Investigation, testified that he conduct-ed certain ballistics tests upon the spent shells discovered by Officer Clayton. He concluded that those shells were fired from the shotgun taken from defendant on the night of the shootings.

Certain statements made by the defend-ant later that night were admitted into evi-dence against him. An ambulance attend-ant testified that on the way to the hospital the defendant asked "how many of them son-of-bitches did I get." When he was told two or three, the defendant responded "is that all." (Tr. 220) Officer Dayle James talked to the defendant in the emer-gency room at the hospital. He testified that the defendant said, "I know you, your're Dayle James. I just wish my slug would have blown your guts out." The de-fendant had also said that he hoped he hadn't shot any Okmulgee or Henryetta police officers. He threatened to make James his next victim, saying that if num-ber four didn't die James would be number four, and if number four did die, James would be number five. The defendant also

made certain statements to Jack Carter, an Okmulgee County Deputy Sheriff. While the defendant was in the emergency room he asked Carter, "how many did I cream." (Tr. 245)

Medical testimony that massive shotgun wounds caused the death of Hembree and the death of Brewer concluded the State's case.

The defense called a number of witnesses in support of the defense theory that, first, there existed a reasonable doubt that the men shot were shot in the midst of the confusion at the scene by someone other than the defendant and, second, that even if the defendant had done the shooting he was not responsible because he was mentally incapable of knowing right from wrong.

The State called a number of witnesses in rebuttal, including a State psychiatrist who testified that the defendant knew right from wrong at the time of the shooting and was competent to aid in his own defense.

In his brief on appeal the defendant argues six propositions for reversal: That the court erred in excusing jurors because of voiced objections or hesitation to give the death penalty; that the court erred in failing to grant a change of venue, and in proceeding to trial with the jury as presently constituted; that the court erred in failing to exclude those jurors having preconceived ideas, for which evidence would be required to change or alter; that the court erred in rejecting the testimony of the ballistics expert offered by the defendant; that the court erred in denying defendant's motion for dismissal for lack of prosecution; and, that 21 O.S., § 701.1 and § 701.2 are unconstitutional.

We consider first defendant's third proposition wherein he argues that the failure of the trial court to exclude from the jury those jurors who stated on voir dire examination that they had formed an opinion as to the guilt or innocence of the defendant constituted reversible error. The defendant's argument here centers upon the testimony during voir dire examination of four jurors, each of whom stated that he or she had formed an opinion about the guilt or innocence of the defendant through conversations with other persons or through reading about the case in the newspapers. Of the four, three jurors were subsequently removed by peremptory challenges; the fourth remained to consider the case.

■■ Any defendant in a criminal case is entitled to a jury composed of persons of a state of mind to accord him the presumption that he is innocent. That a juror be willing to be convinced that a defendant is innocent should the evidence so show is not good enough. On the other hand, a defendant is not entitled to a jury composed of persons entirely ignorant of the facts surrounding the case. Collecting such a jury has become in modern times a near impossibility for the notorious case. See, *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751. Nor is such a jury necessary to protect the defendant's right to a presumption of innocence. A juror is not disqualified because he has formed an impression or a hypothetical opinion about the case through reading or as the result of general conversation. This much is provided by statute. Section 662 of Title 22 of the Oklahoma Statutes provides in part:

> "[N]o person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him. . . ."

■ In this case it is clear that the refusal of the trial judge to excuse for cause the jurors in question was a permissible exercise of his discretion within the limits of that statute. The four whom the judge refused to excuse upon the defendant's challenge for cause were prospective jurors

Dillon, Devaughn, Siberts, and Yandle. Each of these four testified that he or she had read or heard of the case. Not one of them, however, had learned of the case in a manner other than that contemplated by § 662. None of them had talked to prospective witness or other person purporting to have special information about the evidence to be presented at trial. Each declared that he or she could and would set such opinion aside and impartially consider the evidence presented at trial.

Of the four prospective jurors challenged, three were subseqently removed from the jury by defendants' peremptory challenge. Only one, Mrs. Yandle, actually sat in judgment of the defendant's case. In considering a similar set of circumstances, in the case of *Koonce v. State,* Okl.Cr., 456 P.2d 549, we stated:

> "[I]t is abundantly clear that the defendant could not have been prejudiced by this ruling of the trial court since the prospective juror McCormick was peremtorily [sic] challenged and excused by defense counsel and did not serve on the jury which heard defendant's case. . . ." 456 P.2d at 558.

Juror Yandle testified that she had formed a preconceived notion about the case in the course of discussing it within her family. She was asked specifically whether she was able to put that idea aside and render a fair and impartial verdict, and answered in the affirmative. We find no error in the court's ruling here.

■ The defendant contends that the trial court erred in overruling his application for a change of venue. The clear rule is that the granting of a change of venue is discretionary with the trial court and this Court will not reverse a ruling of the trial court denying a change of venue unless it is made to appear clearly that there has been an abuse of this discretion. See, e. g., *Breedlove v. State,* Okl.Cr., 525 P.2d 1254. Whether the refusal of the trial court to grant an application for change of venue constituted an abuse of discretion depends upon whether the defendant was prevented from receiving a fair trial by an impartial jury. See, *Russell v. State,* Okl. Cr., 528 P.2d 336; *Wing v. State,* Okl.Cr., 490 P.2d 1376; cert. den. 409 U.S. 919, 92 S.Ct. 772, 32 L.Ed.2d 119. In the instant case, while many of the prospective jurors questioned on voir dire examination had heard or read of the case, that number were rigidly screened by careful examination conducted by the court and counsel for the State and counsel for the defendant. There is nothing in this record to show that that screening was ineffective and that jurors incapable of giving the defendant a fair and impartial hearing sat in judgment of him. For that reason we find no abuse of discretion in the refusal of the trial court to grant a change of venue.

■ We turn now to defendant's argument that this case must be reversed because his right to a fair trial was prejudiced when the court sustained the prosecutor's objection to the testimony of a ballistics expert offered by the defendant. The testimony objected to involved, an offer of proof reveals, the results of certain experiments conducted with a .12 gauge full choke shotgun loaded with size 6 shot designed to show test patterns and spread patterns of the shells when fired from such a gun at a variety of specified distances. The purpose of the evidence was to contradict testimony by the State's witnesses concerning the distance and angle from which the fatal shots were fired. The objection to this evidence was sustained for the reason that the witness testified that while the gun he used was similar to the defendant's gun, its barrel was two inches longer. The results of tests to determine the distance from which a weapon had been fired are admissible into evidence provided the test was conducted under conditions sufficiently similar to the actual conditions involved in the case that they can be fairly said to have probative value and will enlighten, not confuse, the jury. See, *Cooper v. State,* 61 Okl.Cr. 318, 67 P.2d 981; *Shepherd v. State,* 51 Okl.Cr. 209, 300 P. 421. Whether, however, the circumstances surrounding the

making of the test were sufficiently similar is a question to be determined by the trial judge in his discretion; his ruling will not be disturbed unless there has been an abuse of such discretion. *Cooper v. State, supra.* In this case the witness testified that the shotgun he used was different from that involved in the case in that its barrel was a full two inches longer; he also testified that even in the event that two shotguns are identical they may throw different spread patterns with the same load, and that different ammunition in the same gun may result in a different spread pattern. We do not find that the trial judge abused his discretion in determining that these tests were not sufficiently identical to the actual circumstances at trial to warrant their admission into evidence.

■ It is also urged that the defendant was denied a speedy trial when the court overruled his motion for dismissal for lack of prosecution. The defendant does no more than bring this issue to the Court's attention. He offers neither argument nor authority in support of his contention. The record shows that the crime happened on July 26, 1974. Trial began on February 3, 1975, slightly more than six more months later. Six months is not a sufficient lapse of time to constitute in itself the denial of a speedy trial without a showing of why the delay came about, what the defendant did to protect his right to a speedy trial, and how he was prejudiced by the passage of time. See, *Banhaus v. State*, Okl.Cr., 532 P.2d 434. An examination of this record discloses nether a demand for a trial to be set prior to February 3, 1975, nor any prejudice to the defendant. For that reason we find no merit in this contention. See *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L.Ed.2d 101; *Bauhaus v. State*, supra.

■ We turn now to defendant's contention that the trial judge erred in excusing two veniremen for cause who voiced their objections to the death penalty. In support of this contention he cites *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct.

1770, 20 L.Ed.2d 776. It is unnecessary to reach the question over whether the exclusion of the veniremen in question was justified under the standard set forth in *Witherspoon*. In the case of *Williams v. State*, Okl.Cr., 542 P.2d 554, and in *Justus v. State*, Okl.Cr., 542 P.2d 598, this Court held that the principles announced in *Witherspoon* had no application to 21 O.S., § 701.1, the Oklahoma murder statute then in force, for the reason that that statute provided for a mandatory death penalty. This defendant was convicted under the same first degree murder statute and, consequently, the holding in *Justus* and *Williams* would foreclose his argument here. Even apart from the holding in *Justus* and *Williams,* there would be no reversible error here. In *Witherspoon* the court concluded:

". . . Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. . . ." (Footnote omitted) 391 U.S. at 522, 88 S.Ct. at 1776, 20 L.Ed.2d at 784, 785.

The death penalty in the cases now before us will not be carried out for the reason that we are required under the law to modify sentences of death imposed upon this defendant to sentences of life imprisonment.

■ This brings us to defendant's final contention which is that sections 21 O.S., 701.1 and 701.2, are unconstitutional within the meaning of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 32 L.Ed.2d 346. Defendant makes no argument regarding the constitutionality of the first degree murder statute itself. His citation to *Furman v. Georgia* raises only the issue of the constitutionality of the imposition of the death penalty in this case. This issue has since been determined by the decisions of the United States Supreme Court rendered in *Woodson v. North Carolina,* —— U.S.

——, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), and *Roberts v. Louisiana*, —— U.S. ——, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), and the subsequent decision of this Court in *Riggs v. Branch*, Okl.Cr., 554 P.2d 823 (1976). In that case we determined that the above cited opinions of the Supreme Court left unaffected the validity of statutes enacted by the Oklahoma Legislature in 1973 defining murder in the First Degree and Murder in the Second Degree. We concluded there that the Supreme Court decisions prohibited only the imposition of the death penalty in a case in which the jury was provided no discretion in imposing that penalty. In accordance, therefore, with our holding in *Riggs v. Branch*, we modify the sentences of death imposed in these cases to a sentence to life imprisonment at hard labor in each case.

For the above and foregoing reasons the judgments and sentences appealed from is *AFFIRMED* as *MODIFIED*.

BUSSEY and BLISS, JJ., concur.